## EASLEY v. CLAY. (No. 12121.)

Court of Civil Appeals of Texas. Fort Worth.
April 6, 1929.

Rehearing Denied May 4, 1929.

Scarborough, Ely, Brown & King, of Abilene, for plaintiff in error.

Billingsley & Billingsley, of Fort Worth, for defendant in error.

BUCK, J. James M. Easley filed suit in Taylor county against H. R. Clay of Tarrant county for partnership accounting. He alleged that plaintiff in error, hereinafter called plaintiff below, and defendant in error, hereinafter called defendant, had agreed, during the year 1917, to go into the cattle business together, each to pay into the business 50 per cent. of the needed capital. They were to buy cattle, fatten them for market, and sell them. Each partner was to bear one-half of the expenses incurred, and receive one-half of any profits, or to bear one-half of any losses. There was a considerable loss sustained. Plaintiff prayed for an account-ing and that he have judgment in such amount as the evidence showed was due him.

The original petition is not in the transcript. The first pleading shown in the record is plaintiff's first amended original petition filed in Tarrant county, the cause, it appears, having been transferred from Taylor county to Tarrant county on defendant's plea of privilege.

This amended petition was filed November 5, 1927. In this petition plaintiff prayed for an accounting, and judgment against defendant for such amount as found to be due plaintiff, alleged to be one-half of $6,916, which was alleged to have been improperly withdrawn from the partnership by defendant, in addition to one-half of $7,403.44, which plaintiff alleged was due him for expenses incurred and paid in attending to the partnership affairs. This list of expenses incurred by plaintiff covers some 27 to 29 pages of the transcript, and includes items of expenses from July 12, 1917, to January 10, 1927, for the expenditure of which plaintiff asks a recovery.

Defendant answered plaintiff's original petition by an original answer filed September 27, 1926, and by an amended answer filed October 26, 1926. He pleaded both the two years and the four years statutes of limitation. He further sets out items of partnership expenses which he paid, and had stood good for, and pleaded for judgment against the plaintiff in the sum of $9,098.29. Plaintiff pleaded as to defendant's cross-action the four years statute of limitation.

The cause was tried by the court, without the intervention of a jury, and the court found that defendant had expended in the interest of the partnership affairs $9,400 more than plaintiff had expended, and gave judgment for defendant in the sum of $4,700. From this judgment the plaintiff has appealed.

### Opinion.

The only question presented on this appeal is that all of the items set up in defendant's cross-action were barred by the four years statute of limitation, and the court erred in rendering judgment against plaintiff on such items.

The evidence shows that the last of the cattle owned by the partnership were sold in June, 1920. Appellant urges that the sale of the last of the partnership effects marks the time from which limitation should begin to run.

The statute of limitation governing actions of partnership accounting is article 5527, § 3:

"There shall be commenced and prosecuted within four years after the cause of action shall have accrued, and not afterward, all actions or suits in court of the following description: * * *

"3. Actions by one partner against his co-partner for a settlement of the partnership. accounts, or upon mutual and current accounts concerning the trade of merchandise between merchant and merchant, their factors or agents; and the cause of action shall be considered as having accrued on a cessation of the dealings in which they were interested together."

Plaintiff had five or six pages of items of expense alleged to have been incurred subsequent to June, 1920, a number during each year down to January, 1927. He was seeking to recover for items of expense incurred subsequent to four years after the cattle had all been disposed of. Likewise, defendant set up various items of alleged partnership expense incurred by him, subsequent to the sale of the last cattle, and more than four years subsequent thereto.

That the parties composing the partnership considered that they were still partners subsequent to the sale of the cattle in 1920 is shown by their evidence, plaintiff below testifying:

"I did not say on yesterday that when I paid the $8,000.00 to the Guaranty Cattle Loan Company, that I considered that I was out of the Clay and Easley cattle transaction. The agreement then was that the Clay and Easley operations would be continued as a partnership business, and that we would buy other cattle and I went ahead and made this payment on their word and promise that they would be continued. * * * I did not keep stubs of the drafts because I expected to make an accounting with Mr. Clay on a statement that would be produced by the Guaranty Cattle Loan Company. * * * I found that I owed them a balance after that $8,000.00 was paid; I have never paid that balance. * * * All our cattle had been sold at that time, but we expected to buy more; we did not buy any more, but I spent some money inspecting other cattle. I charged up here the expense I incurred when I was going around inspecting cattle that it was contemplated would be both for Clay and Easley and when I was done at Mr. Clay's request, and with his approval. * * * I called on Mr. Clay to render me an account in writing; I have written him letters asking him to account and execute this contract as it was agreed by Swift several times, and I finally had to bring it to a show-down with this suit."

Defendant testified:

"After all these other items were paid, we still owed the Guaranty Cattle Loan Company over $8,000.00, and we still owe that to them; it has not been paid * * * in fact, they were carrying $12,000.00 then, unsecured papers when we shipped these cattle to my ranch. * * * It is true that I do not now owe Mr. Swift or the Guaranty Cattle Loan Company anything on this $20,000.00 obligation, the last payment on that obligation was made on December 12, 1927. * * * I have offered to account to Mr. Easley; I have offered to do so at various times and particularly about 1925. When I was officing in the Dan Waggoner Building, Mr. Easley would come in the office and ask if I had ever paid anything on the note at the First National Bank and on the $20,000.00 I owed Swift, and I told him what I had done at the First National Bank * * * that I was keeping the interest up, and that I had paid Mr. Swift $6,414.00 on the mortgage."

With reference to a government claim arising out of this partnership, which was testified to be pending in the courts of Kansas, at the time this suit was tried, defendant testified:

"I knew that Mr. Easley claimed some big damages on account of the seven-bar steers. I did help to get that money to Mr. Swift (of the Guaranty Cattle Loan Company). All of that money did not come out of the Montgomery & Easley steers (another partnership in which Easley was interested); I cannot say that practically all of it came out of those cattle. I think the whole claim was about forty odd hundred dollars, and I think proportionately, the way we settled with Mr. Nations that I was possibly interested to the extent of $1,000.00—I mean the firm of Clay & Easley. I think our firm originally claimed $7,568.67; Mr. Easley got it out and we checked it over, and I signed it, and there was approximately one thousand dollars of the seventy-five hundred dollar claim, that belonged to Clay & Easley. I think that is right; I don't know; I never paid much attention to it. There was about four thousand dollars paid in settlement, or about fifty cents on the dollar. Clay & Easley's part of the settlement may have been about $500.00, ($5,000.00?).

"I did undertake to divert that check and to apply it on the indebtedness of Clay & Easley to Swift, if it was possible to do it; we owed the money and I thought it ought to go where it belonged. I would have liked to put it all there, if it would have released him from his part of the $8000 debt there. As a matter of fact, Mr. Easley had agreed with me that he would let $2500 of that money go on this $5000 at the First National Bank, down to July, 1925, and I had so stated to Mr. Connell (President of the First National Bank), that when we collected that money, he would get it."

The defendant offered in evidence various checks showing payments made by him to the First National Bank of Fort Worth, on the principal and interest of the notes, the principal aggregating approximately $5,000, which canceled checks began with one dated on October 28, 1920, in the amount of $75, and continued through some 20 odd checks in various amounts, all drawn on the First National Bank, and all signed by H. R. Clay, and having notations on the checks, some of

them, "interest on Clay & Easley's note," and others "payment of Clay & Easley note," down to the last check of July 12, 1927, for $1,027.24. In a list of creditors from the partnership transaction, which plaintiff testified he had received, were amounts from November 11, 1918, to November 27, 1925, making a total of $639.23.

The testimony of Mr. Swift is that Mr. Clay paid to him $20,000 in installments, and that after the obligations were given same were subsequently paid.

■ From the undisputed evidence, as shown above, it is without doubt that, as far as the debts and obligations of this partnership were concerned, the same existed continuously down to the year 1927. If the sale of all the cattle in 1920 absolutely ended the partnership between these two parties, then, of course, the suit of defendant on which judgment was obtained was barred by limitation. But we do not think that this can be so where the debts, obligations, and moneys to be collected and paid are continuing obligations, and there has been no partnership accounting between the parties. Since each of the partners paid out moneys on the partnership obligations during practically every year from 1917 down to and including 1927, and there had been no accounting, we are of the opinion that the statute of limitation would not begin to run until the partnership transactions had ceased, because the partners had not ceased in the dealings in which they were interested.

In Rowley on Modern Law on Partnership, vol. 2, p. 981, § 718, under the heading "Time to sue and limitation of actions," it is said:

"The general rule is that an action for accounting may be brought immediately after dissolution of the partnership. The statute of limitations applies to equitable actions between partners for an accounting, and generally speaking, it begins to run at the date of the maturity of the cause of action sued on, and does not run before dissolution upon an action brought after dissolution. But as to the exact time after dissolution when the statute begins to run, there is little uniformity in the decisions, some holding that time to be immediately on dissolution, others when the settlement is had and the balance struck, others after a reasonable time for settlement; others at the time of the last item or transaction on account between the partners, others, if the agreement creates a continuing trust, at the time of the repudiation of the trust, or of demand, while others make the time dependent on the circumstances of each particular case."

Under the last enunciation of the holding of the courts, to wit: "While others make the time dependent on the circumstances of each particular case," the note under this statement includes Roberts v. Nunn (Tex. Civ. App.) 169 S. W. 1086, writ of error refused. The court there said:

"As will be seen from the trial court's findings, the three parties assumed the payment of $14,280 due on the land to one Chanslor. In making the sale to Muncey for the last 160 acres of the land, he assumed to pay, of that indebtedness, $1,506.85, leaving a balance due Chanslor on the indebtedness by the three partners $738, one-fourth of which was properly chargeable to Nunn. Roberts paid this sum out of his individual money November 3, 1910, and seeks contribution for the sum in his petition for accounting. This suit was filed August 22, 1913; the suit was brought two years and nine months after Roberts paid off the indebtedness, and five years and four months after the last land was sold. Gist died April 26, 1907, and all deeds after that date were executed by Mrs. Gist, as community administratrix, in connection with the other parties to the contract. A partnership is at an end when the particular transaction or venture for which it was organized is completed. The sale of the land in this instance was a transaction to be accomplished, but it was also a part of the venture to sell for a profit. This could not be until the obligation of the copartners had been fully paid off and discharged. This was as much part of the partnership transaction as any other. The death of Gist dissolved the partnership, but left the duty of the survivors to wind up its affairs. This they undertook to do by selling the land and paying the obligations of the firm out of the partnership property. It will be noted that several tracts of land were sold after the death of Gist. * * * A dissolved partnership continues in force in legal contemplation for the purpose of winding up its affairs until a full settlement has been had and all outstanding liabilities have been met. * * *"

The cause of action then accrues, and the suit must be brought within four years thereafter. Until the dealings of the parties are finally concluded and the obligations of the partnership paid, and an accounting and full settlement had, limitation does not begin to run. The Supreme Court held, in the case of Morris v. Nunn, 79 Tex. 125, 15 S. W. 220, that for items due an individual partner, but intermingled with partnership accounts, the four years statute of limitations as to such, applied from the cessation of the dealings.

In 20 R. C. L. § 139, page 924, it is said: "If a partner purchases a firm note, he cannot sue his copartners and obtain judgment in an action at law, his only remedy being a proceeding for the settlement of the partnership wherein the rights of all the parties may be adjudged." See, also, 20 R. C. L. § 145, page 929.

■ The evidence shows that H. R. Clay paid to the Guaranty Cattle Loan Company certain checks from February 8, 1927, to

December 12, 1927, aggregating $14,280.06. He could not sue his partner Easley for his pro rata part of this indebtedness, until the indebtedness should be paid by him. None of these payments were made within the period of limitation fixed by statute.

In some cases the statement is made that the final sale of partnership effects marks the end of the partnership dealings. See Bluntzer v. Hirsch, 32 Tex. Civ. App. 585, 75 S. W. 326. And while we believe in that case the holding that the claim was barred by limitation is probably correct, yet we think under the circumstances shown in the instant case that limitation did not bar the amount claimed by and awarded to the defendant below.

The judgment is affirmed.